BRANDON v. CABINESS.

1. When the record discloses, that leave was given to make the assignee of a bankrupt a party by *sci. fa.*, and no objection was made, then, or afterwards, by the other party, but agreements entered into by consent, in which he is

considered a party to the suit, the objection cannot be made in this court, that he was not made a party by bill of revivor.

2. Where one obtains an injunction to the collection of a judgment, which is dissolved on the answer of the defendant, and the cause continued, and after the collection of the money, the complainant becomes bankrupt, the assignee in bankruptcy, is a necessary party complainant.

3. When the *onus* of proving a fact is upon the defendant, if the proof adduced leaves it in a state of doubt and uncertainty, the fact cannot be considered established.

4. The rule that proof cannot be received of the admissions of a party, unless there is an allegation setting forth when, where, and to whom, such admissions were made, does not apply to the case made by the defendant in his answer. Whether it applies in this State, to the case made by the complainant—*Quere?*

Error to the Chancery Court of Madison.

THE bill was filed by Kennon Harris, against Samuel Hughes, who died during the progress of the suit, and it was revived in the name of W. Brandon, his administrator.

The bill alledges, that the complainant was indebted to the firm of Bierne & Patton, who had a judgment against him. That to discharge the judgment, he borrowed from Hughes $600, and shortly afterwards sold to Hughes a negro boy, by the name of Sam, in payment of the money so borrowed, which satisfied him for the whole amount so borrowed, except about $8 56, which he has since paid. That Hughes afterwards procured, about the 6th April, 1840, an assignment of the judgment from Bierne & Patton, has caused the execution to be again issued, and levied upon the land of complainant, &c. The prayer of the bill is for an injunction.

Bierne & Patton answer the bill, but their answers are not important.

Hughes answers and sets forth facts, asserting his right to an assignment of the judgment, in consequence of his advancing money to Harris. to pay a debt for which the judgment was a security. As it respects the slave Sam, he denies the allegations of the bill, and asserts that on the 9th of May, 1840, Harris sold to him the negro boy Sam, for $600, in part payment of a note under seal, which he still holds on

him, and the credit entered by Harris himself, in his own hand-writing, except his (Hughes') signature thereto. He further says, that the advance made by him, was not a loan, but was a purchase of the judgment.

Upon the coming in of the answers, the Chancellor dissolved the injunction, and authorized an execution to issue, upon a refunding bond being executed.

At a subsequent term an entry was made as follows:

Came the parties by their solicitors, and the bankruptcy of the complainant being suggested, it is ordered by the court, leave be given to revive in the name of Septimus D. Cabiness, assignee in bankruptcy, on his being indemnified against the costs of this suit.

Many depositions were taken, the substance of which sufficiently appears in the opinion of the court.

The cause coming on to be tried, the Chancellor considered, that the proof established that the negro boy Sam, was sold by Harris to Hughes, in discharge of the judgment, and decreed a perpetual injunction, &c.

The assignments of error are—In reviving the bill in favor of the assignee in bankruptcy.

In treating as evidence the depositions which proved the conversations, declarations and admissions of Hughes.

In perpetuating the injunction.

SILAS PARSONS, for plaintiff in error. The assignee had no interest in this question. The contest was, whether a bankrupt; had paid a negro in discharge of one of two debts, which he owed to Hughes. It was one of the objects of the bill to relieve some land from the lien of the judgment, but that was accomplished by the execution of the injunction bond.

When the answer set up the credit indorsed upon the note the bill should have been amended, so as to charge, that it was procured by fraud, or made by mistake. [6 Johns. R. 543.] \

The admissions of Hughes not being put in issue by the bill, were improperly admitted in evidence.

CLAY & CLAY, contra. The subject in controversy was a

part of the "bankrupt's property, or rights of property," and was "a suit in equity then pending, in which the bankrupt was a party," and is therefore within the letter of the bankrupt law.

The counsel went into an elaborate examination of the testimony, to show that it sustained the Chancellor's decree.

As to the proof of the admissions of Hughes, they contended the objection came too late, not having been taken before the Chancellor. That he had full notice by the interrogatories, of what was intended to be proved, and to produce his counter proof if he had any.

ORMOND, J.—The objection, that the assignee in bankruptcy was not made a party by bill of revivor, cannot prevail. It appears that the parties appeared by their solicitors, and the bankruptcy of complainant being suggested, leave was given to revive in the name of Cabiness, the assignee in bankruptcy, on his being indemnified against the costs of the suit. At a succeeding term an agreement was made by the counsel on both sides, that the depositions be opened by consent. This agreement, which is signed by the counsel, is headed, "Cabiness assignee v. Brandon adm'r." We think this will admit of no other interpretation, than that the parties consented, that Cabiness was a party to the suit, at that time without a bill of revivor. The only condition imposed, was, that he should be indemnified against the costs, which was evidently for his security. He is afterwards found acting, and recognized as a party in the cause. After this it is too late to object in this court, that he was not properly a party. Having recognized him as such in the court below, the counsel for the opposite party cannot now object, that he is not regularly in court. Such appears to have been the course pursued in other instances, several parties having been made by consent.

Neither can the objection, that the assignee in bankruptcy had no interest in the controversy, prevail. The bill was filed by Harris, to prevent the collection of a sum of money by execution, and an injunction was granted. The injunction having been dissolved, the cause was continued to recover back the money, which was collected upon the execution.

This is certainly such an interest as would pass to the assignee in bankruptcy, the complainant having become a bankrupt after filing his bill. The 3d section of the bankrupt law, divests the bankrupt of all his property, and "rights of property of every description, and all suits in law or in equity, then pending," and vests the same *ipso facto* in the assignee, authorizing him to conduct such suits to a conclusion. This appears to be within the letter of the law. It can make no difference that the *lien* of the judgment was discharged by giving the injunction bond, the money, if this suit is successful, is to be refunded, and must go either to the bankrupt or his assignee. But it is clear the bankrupt can have no right to it, that is gone by the bankruptcy, it must therefore vest in the assignee. At least this is the necessary inference, until it is shown that some other person has a right to it.

The remaining question is the propriety of the decision of the Chancellor upon the facts of the case. The matter in dispute is, whether the slave Sam was sold by Harris, to Hughes, to satisfy in part a debt due from the former to the latter, or whether it was in repayment of the sum of $600, advanced by the latter to the former, to discharge a judgment in favor of Bierne & Patton, against Harris. The latter is the case made by the bill, the former is the defence set up by Hughes, in his answer, denying the allegations of the bill.

The substance of the facts, as stated in the bill, is, that Bierne & Patton, having a judgment against the complainant, he procured from Hughes the money necessary to discharge it and a short time afterwards sold him a negro boy by the name of Sam, at the price of $600, for the purpose of refunding the money he had borrowed. That the sale of the slave paid the money he had borrowed, except $8 56, which he has since paid. That the money was paid to Bierne & Patton, through the agency of one Donegan, but that Bierne & Patton failed to make satisfaction of the judgment, but transferred it to Hughes.

Hughes states in his answer, that a purchase was spoken of between the parties, but never completed, and was abandoned. That he advanced the money, upon an agreement,

that he was to have the use and benefit of the judgment. This advance was made in April, 1840, and on the 9th May succeeding, he purchased the boy Sam, at the price of $600, in payment to that extent of the bond which he held on complainant, which was due on the 22d July, 1836, for $2,-785 15. That the credit was entered on the bond by the complainant himself, in his own hand-writing, the defendant signing his name thereto. The bill was filed the 1st January, 1842, to prevent the collection of the money.

This allegation of the answer setting up a purchase of the slave by extinguishing to that extent the bond held by Hughes on the complainant, is affirmative matter, not responsive to any allegation or statement of the bill, and must be established by the defendant. For this purpose he examined two witnesses, Daniel and Steger, who knew nothing of the transaction, but were called to prove the handwriting of complainant, making the credit on the bond. They both state that they are acquainted with the hand-writing of Harris, and Daniels answers positively that it is his hand-writing. Steger says he is not positive, but believes it is in the handwriting of Harris.

The complainant examined two witnesses to this point, Corbin Lewis and McBroom. The former states that he has known the hand-writing of Harris, but for the last ten or eleven years has had but little knowledge or acquaintance with it, and does not think it is the hand-writing of Harris. McBroom professes to know the hand-writing of Harris, says it is his signature to the bond, but does not know who wrote the indorsement on the back of the bond.

In our opinion, there is but little, if any difference between the testimony of these witnesses, for and against the writing as the act of Harris, and the effect is to leave the mind in a state of doubt as to its genuineness. It is true, Daniel swears positively that it is the hand-writing of Harris, but in whatever language it may be couched, it is evident that such testimony is mere opinion; it is nothing more than a comparison in the mind, by the aid of former experience. The vividness of this comparison so made, or the strength of the opinion entertained, may depend upon the superior opportunities afforded for the formation of a correct judgment, or it may be

influenced by the habit and disposition of the witness. One person will decide positively on slight resemblances, whilst another will require something like mathematical proof, or occular demonstration, as the basis of his judgment; not to speak of the influence which moral considerations would exert over different persons, in swearing to facts, which could not be known with certainty.

When McBroom, who professes to know the hand-writing of Harris, says, he does not know whose hand-writing it is, it is but another form of expression for saying he does not think it is the hand-writing of Harris, as his attention was drawn to it, for the purpose of saying whether it was written by Harris, or not. In such a case, where the writing itself is not before the court, some consideration is due to the judgment of the Chancellor, and in speaking of it he says, "an inspection of the paper itself, does not give me a very high opinion of the judgment of the witness, (Daniel,) in such matters.

The result is, that it is left in a state of doubt, and uncertainty, whether the writing was executed by Harris or not; and this was a matter which the defendant assumed the burden of proving. There are, however, other circumstances in the case, without adverting to the positive confession of Hughes, which will be hereafter mentioned, which inclines the scale decisively against him. It is charged in the bill, that when the slave was sold to Hughes, it paid off and satisfied the advance Hughes had made for Harris, except $8 56, which he has since paid. This circumstance is quite important, as it is very improbable that if the version of Hughes is the correct account of the transaction, any such balance would have been thus settled. Hughes' account of the matter, is, that for the money advanced, hew as to have the benefit of the judgment, why then take from Harris a note for the excess over the purchase money of the negro? This important allegation of the bill is not answered, and the inference from his silence is very strong against him, if it is not indeed an admission.

The case made by the bill is natural, and probable. The defence set up is highly improbable. Harris, it seems, had been struggling for some time to avoid the payment of this

21

judgment by a sale of his property. Previous to this transaction, he had drawn a bill, upon which the money was advanced by the acceptors, and the judgment was kept open for their benefit, and it was to pay this bill, that the money was obtained by the complainant from Hughes. By the sale of the slave in the manner contended for by the defendant, he still left the judgment in force against him, and accomplished nothing by the arrangement.

In addition, the complainant proved beyond all doubt, by several witnesses, and the admissions of Hughes about the time of the transaction, that he had purchased the slave from Harris in satisfaction of the execution, which he had advanced the money to pay off. And from the testimony of two witnesses, it appears, that in 1842 he declared, that he had old Mr. Mead's bond, and would credit the note he held on Harris with the price of the slave. Meade, it appers, was the surety of Harris in the injunction bond.

It is not necessary to dwell on this testimony, its effect if admissible is overwhelming. But it is insisted, that the proof was improperly admitted, as the concessions of Hughes were not put in issue in the bill. We do not consider it necessary in this case, to enter upon an examination, to what extent, if any, this rule obtains in this State. In England, the rule doubtless is as stated. From the recent case of Austin v. Chambers, in the House of Lords, 6 Clark & Finelly, 38, it would seem that the rule is founded upon the secrecy with which evidence in chancery is taken, as it is there put upon the fact, that the party would be deprived of the power of cross-examining the witness, if the name of the person was not stated in the bill to whom the admissions were made. This objection could not apply in this State, where the party must always have the power of cross-examination.

But be the rule what it may, it does not apply to the case made by the defendant in his answers, which doubtless may be disproved by his admissions.

Let the decree of the Chancellor be affirmed.